IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

LAWRENCE W. MOON, JR.,                    )
                                          )
            Plaintiff,                    )
                                          )
                                          )
v.                                        )        No. 3:05-CV-102
                                          )
ALBERTO GONZALES, UNITED                  )
STATES ATTORNEY GENERAL,                  )
DEPARTMENT OF JUSTICE,                    )
                                          )
            Defendant.                    )

## MEMORANDUM OPINION

This civil action is before the court for consideration of "Defendant's Motion to Dismiss Counts II and III of the Complaint or, in the Alternative, for Summary Judgment" [doc. 22] [1] and "Defendant's Motion for Summary Judgment on Count 1 of the Complaint" [doc. 74]. Responses to both motions have been filed by plaintiff [docs. 60, 80], and defendant has submitted reply briefs [docs. 69, 86]. The motions are now ripe for the court's consideration.

Plaintiff has filed suit pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, (Count I); the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794 *et seq.*, (Count II); and Title VII of the Civil Rights Act of 1964 ("Title VII"),

---

[1] Defendant's motion and plaintiff's response to that motion have extensive documents attached to them which the court has considered. Therefore, this motion will be treated as a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. *See* Fed. R. Civ. P. 12(b).

42 U.S.C. § 2000e *et seq*. (Count III). Plaintiff contends that he was discriminated against based on age and disability and that he was retaliated against when he pursued a complaint with the EEOC. For the reasons stated herein, defendant's motion as to Count I, the ADEA claim, will be denied. Defendant's motion as to Counts II and III will be granted in part and denied in part. It will granted as to Count II, the RA claim, which will be dismissed. The motion will be denied as to Count III, the Title VII retaliation claim.

## I.

### *Background*

The record in this case is voluminous as are the facts. At this point, the court will present a basic outline of the facts that will set a background of what occurred in this case. Other factual matters will be identified and developed at appropriate times during the analysis of plaintiff's individual claims.

Plaintiff has been licensed to practice law since 1968. In 1992, he was hired as an Assistant United States Attorney ("AUSA") for the Middle District of Tennessee in Nashville where he served until he retired at the end of 2003. Plaintiff testified that he has represented the government in hundreds of cases and that during his tenure he never lost a jury trial. In January of 2000, plaintiff became separated from his wife, and they later divorced. Plaintiff was also diagnosed with depression around this time and was given medication by his personal physician. This fact was made known to the First Assistant U.S. Attorney.

2

AUSA Delk Kennedy, a personal friend as well as one of plaintiff's work colleagues, noticed changes in the plaintiff's demeanor during 2000 and 2001 as plaintiff became more depressed. Plaintiff was eventually diagnosed with major depression, and in early to mid 2002 his condition deteriorated to the point where Kennedy could no longer be around him. At some point, plaintiff's mother died, and this contributed to his depression. Kennedy discussed plaintiff's condition with other attorneys in the office including members of management.

James K. Vines became United States Attorney for the Middle District of Tennessee in February 2002. Vines began instituting management changes and expressing a desire to have older attorneys leave the office. At the time, plaintiff was one of the older attorneys in the office. AUSA Debra Phillips became Criminal Chief in January of 2003; Phillips had been an AUSA since 1989, so she had known plaintiff during the entire time of his employment with the office. After the announcement that Phillips would become criminal chief, Kennedy had a conversation with her in which Kennedy said plaintiff was not taking his medication, he needed help, and his condition was affecting his work. Kennedy had also spoken with Phillips in the summer of 2002 about the fact that plaintiff was not taking his medication and that he needed help.

In June 2002, AUSA Van Vincent was made a team leader of the narcotics section and became plaintiff's direct supervisor and rating official. When Phillips became Criminal Chief in January 2003, Vincent was named Civil Chief.

During the winter of 2003, Phillips told plaintiff that she was not satisfied with

3

his work. Plaintiff was transferred to the Asset Forfeiture Division in April 2003, but he was still required to work on his remaining criminal cases. On May 30, 2003, Phillips told plaintiff that she was seriously considering placing him on a Performance Improvement Plan ("PIP"). That conversation occurred on a Friday afternoon, and plaintiff did not return to work on Monday June 2, 2003, because he called in sick. Plaintiff's psychiatrist Dr. Rodney Poling, who began treating plaintiff in February of 2003, wrote a letter to the defendant dated June 6, 2003, in which he stated that he was treating plaintiff for major depression and that plaintiff needed to continue on medical leave for several weeks. In a letter dated July 23, 2003, Dr. Poling stated that plaintiff was released to return to work beginning July 28, 2003, and that plaintiff was "fully capable of discharging his duties as a U.S. Attorney." Dr. Poling asked that plaintiff be restricted to a four day week with a day off in the middle of the week "if practicable."

Plaintiff returned to work on July 28, 2003, and on July 29, 2003, he was placed on a PIP that was to last 60 days. Under the PIP, plaintiff had very specific assignments and was required to meet weekly with Vincent.

Plaintiff contacted the EEO Officer on July 30, 2003. On September 13, 2003, plaintiff filed a discrimination complaint alleging age discrimination and a failure to accommodate his psychiatric condition of major depression.

On September 23, 2003, defendant reported plaintiff to the Office of Professional Responsibility ("OPR") for alleged violations of professional responsibility

4

obligations in several criminal cases. Plaintiff did not learn of this until he received a letter from Vincent dated November 21, 2003. Once plaintiff left the office, OPR closed its file.

Also on September 23, 2003, plaintiff was absent from work on a sick day. Via a letter dated September 24, 2003, Dr. Poling stated that plaintiff would need to be out of work from September 25, 2003, until October 20, 2003, due to the acute exacerbation of his illness. On October 9, 2003, Dr. Poling reported to defendant the plaintiff's depression symptoms had returned, and on October 31, 2003, Dr. Poling informed defendant that his recommendation for plaintiff was for him to remain on medical leave indefinitely. Plaintiff did not return to work and retired effective December 31, 2003. This case was filed on February 7, 2005.

## II.

### *Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Canderm Pharmacal, Ltd. v. Elder Pharms., Inc.*, 862 F.2d 597, 601 (6th Cir. 1988) (quoting Fed. R. Civ. P. 56(c)). The moving party may discharge its burden by demonstrating that the non-moving party has failed to establish an essential element of that party's case for which he or she bears the ultimate burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

5

(1986). The moving party need not support its motion with affidavits or other materials negating the opponent's claim. *Id.* at 323. Although the moving party has the initial burden, that burden may be discharged by a "showing" to the district court that there is an absence of evidence in support of the non-moving party's case. *Id.* at 325 (emphasis in original).

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

III.

*Analysis*

A. Count I - ADEA Claim

6

The ADEA prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). An employee can establish an age discrimination case by both direct and circumstantial evidence. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). "Direct evidence of discrimination is 'that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). It is evidence "that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004) (citations omitted). Circumstantial evidence, on the other hand, does not facially establish discrimination but permits the factfinder to draw reasonable inferences that discrimination occurred. *Kline*, 128 F.3d at 348.

The plaintiff herein contends that he has presented both direct and circumstantial evidence in support of his age discrimination claim. The court will address each of these contentions.

### 1. Circumstantial Evidence

Plaintiff argues that he has met the *McDonnell Douglas-Burdine* burden-shifting analysis for his ADEA claim based on circumstantial evidence. To demonstrate a prima facie case of age discrimination under that analysis, the plaintiff must show that 1) he

7

was 40 when the alleged discrimination occurred; 2) he suffered an adverse employment action; 3) he was qualified for the subject position; and 4) he was replaced by a younger person. *Kline*, 128 F.3d at 349. Once plaintiff successfully states a prima facie case, the burden of production shifts to the defendant to provide a nondiscriminatory reason for the employment action. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998). If the defendant meets this burden, the plaintiff has the burden of demonstrating that the proffered reason is a pretext for age discrimination. *Id*.

Prima Facie Case

Defendant concedes that plaintiff has met the first prong of the prima facie case as he was over 40 at the time the alleged discrimination occurred. Defendant also concedes for the purposes of this motion that someone outside of plaintiff's protected class replaced him. However, defendant argues that plaintiff cannot meet the second and third prongs of his prima facie case, that he suffered an adverse employment action and that he was otherwise qualified for the position of an experienced AUSA. Plaintiff argues that the adverse employment action he experienced was constructive discharge and that he was qualified for the position of AUSA.

The court will first examine whether plaintiff experienced an adverse employment action by being constructively discharged. In *Logan v. Denny's, Inc.*, 259 F.3d 558 (6th Cir. 2001), the Sixth Circuit addressed the meaning of the term "constructive discharge."

8

> To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit. . . . To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined.

*Id*. at 568-69 (internal quotation marks and citations omitted). In *Logan*, the Sixth Circuit set forth factors a court should consider when determining whether an employer has created working conditions that a reasonable person would consider intolerable. The Court stated:

> Whether a reasonable person would have [felt] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id*. at 569 (quoting *Brown v. Bunge Corp*., 207 F.3d 776, 782 (5th Cir. 2000)). The list is not exclusive. *Saroli v. Automation & Modular Components, Inc*., 405 F.3d 446, 451 (6th Cir. 2005) (citing *Logan*, 259 F.3d at 570). The defendant's "[i]ntent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions." *Moore v. KUKA Welding Sys*. & Robot Corp., 171 F.3d 1073, 1080 (6th Cir. 1999).

Defendant argues that plaintiff cannot demonstrate that he was constructively discharged because he cannot show that he was placed on the PIP or that the PIP was administered in such a fashion as to force him to quit, nor can plaintiff show that his quitting

9

was a foreseeable consequence of the PIP and its implementation. Defendant contends that the very nature of the PIP was to help plaintiff to improve his performance to a satisfactory level and that under the PIP he was not asked to perform more than what other criminal AUSAs were required to do.

The court, however, believes that plaintiff has presented sufficient evidence to raise a material issue of fact concerning whether he was constructively discharged. The PIP and the implementation of it cannot be considered in a vacuum but must be viewed within the entire context of the facts and circumstances of this case. The PIP was presented to plaintiff the day after he returned from two months of medical leave for the treatment of major depression. The PIP was 13 pages in length and described in great detail plaintiff's deficiencies as well as its very detailed requirements. For example, the PIP included the following:

> Your normal duty hours will be from 8:30 a.m. until 5:00 p.m. As needed, you will work beyond those hours to file all necessary responses and to otherwise prepare your cases.
>
> To further assist you, you are to maintain a calendar in a Government Appointment Book during the PIP. Each work day, you are to complete a log of your activities during the day. You will enter the name of the matters on which you are working, e.g., case name and type of document - United States v. Jones subpoena, in half hour increments. You are also to mark on the calendar the times you arrive and depart work; your lunch hour departure and return; all business telephone calls, (received and placed) by name of individual or organization with whom you conversed; meetings attended; and work conversations. You are to submit this calendar to Mr. Vincent each Wednesday evening.
>
> A factfinder could certainly conclude that the timing of the PIP was suspect,

10

especially because when plaintiff first returned to work he was likely vulnerable and emotionally fragile. The administrative investigation record contains an investigational questionnaire completed by AUSA Robert Watson. In response to the question of whether he had information relevant to the issue of constructive discharge, Watson stated, "The timing of this [placing plaintiff on a PIP] could not have been more malicious, and was in my opinion intended to make sure that Mr. Moon could not stabilize himself in his work habits before coming under intense scrutiny." He also commented that in his opinion reporting plaintiff to the OPR was "an improper use of OPR, strictly as a threat to make Mr. Moon think if he refused to leave the office there was a possibility that OPR could sanction him and this might result in losing his law license."

Plaintiff contends that the weekly meetings with Vincent concerning the PIP were hostile and abusive in that Vincent berated and yelled at him. Plaintiff's former legal assistant, Sherry Lester, stated the following in her declaration:

> In 2003, Mr. Moon was experiencing both emotional and physical health problems. While under physician's care, Mr. Moon took some much needed sick leave. Upon returning to work, he was put on a PIP (Performance Improvement Plan) by the U.S. Attorney and the PIP was supervised by Assistant U.S. Attorney Van Vincent. When an employee is put on a PIP, they are given daily, weekly, and monthly assignments with deadlines. Mr. Moon, even though he had a busy trial schedule, was still given these same deadlines. In my opinion, these deadlines were impossible to meet. When a deadline was not met, AUSA Van Vincent would come to Mr. Moon's office,

shut the door and literally scream at him for not meeting those deadlines or "PIP goals." (My work area was about 8 steps across from Mr. Moon's office door, and I, as well as anyone that happened to be walking down the hall, could very easily hear what was going on in Mr. Moon's office). One of the most amazing facts about these sessions is that on many occasions, AUSA Vincent would come out of Mr. Moon's office smiling, as though he was very proud of what he had just done.

AUSA Kennedy testified in his deposition as follows:

A.      Those meetings with Vincent, you know, they'd be down here and - - I mean even with the door shut, you could walk by the door and my office was right there (pointing.), and I think he had his secretary over here (pointing.). You could hear just diatribes, you know, just - - Larry would be in there for hours. Hell, he was spending half - - I'm being, I'm getting - -

Q.      Try to be as specific as you can.

A.      He was spending a lot of time in there getting diatribes from Vincent and nothing constructive that I could ascertain. And of course, that would affect his mood.

Q.      Okay. And what about his ability to complete the requirements of the PIP within the confines of the restrictions that he had?

A.      Four, light days? There's just no way.

Q.      Okay. Did Mr. Moon talk to you about his difficulty in fulfilling the requirements?

A.      I'm trying to think. At some point I started to talk to him and said, "Larry" - - you know, he was trying to work late, work on weekends. We quit riding together, because he would be up here 'til late, you know. He was working on Wednesdays when he wasn't supposed to be.

And it was obvious, I mean, you could read Vincent's memos. I mean, you know, take Wednesdays off if you want,

12

but if all this work isn't done, you know, you failed. And whatever amount of time it takes. I think somebody said it took six months by several attorneys to finish up Larry's case load after he left, and I'd say that's probably right. And Vincent was just wanting it all done instantly, by one person.

Q. Let me ask you this.

A. So you know, I talked to him. I said, "Larry, they're going to fail you, and you're not, you know, you can't do all this. You're just digging yourself in deeper with this depression and everything. You know, at some point, he said, "I can do it, I can do it, I can do it."

The Vincent memos are summaries of the weekly meetings he had with plaintiff. They are all 11 to 13 pages long and contain requirements that could be considered daunting, especially for someone dealing with depression. Each successive memo contains a recitation of the items plaintiff had performed or had not performed to Vincent's satisfaction. These were emailed to plaintiff and, according to handwritten notations at the end of each, a hard copy was left in plaintiff's chair in the evening.

While defendant's position is that the PIP was designed to help plaintiff be successful, a reasonable factfinder could conclude the opposite, that it was designed to set plaintiff up to fail. Viewing the evidence in the light most favorable to the plaintiff, the court finds that plaintiff has presented sufficient evidence to raise a material issue of fact as to whether plaintiff suffered "badgering, harassment, or humiliation by [his] employer calculated to encourage" his resignation. The timing of placing plaintiff on the PIP and Vincent's actions in implementing it could certainly be viewed as conduct intending to force plaintiff to leave, especially if Vines wanted the older attorneys out of the office. The

13

treatment of plaintiff during the implementation of the PIP could be reasonably seen as a means of forcing the plaintiff, one of the older attorneys, out of the office.

"In determining whether an environment is one that a reasonable person would find hostile or abusive and that the plaintiff in fact did perceive to be so, courts look at all of the circumstances." *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 635 (6th Cir. 2003) (quoting *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)). Plaintiff was put on the PIP the day after returning from two months of medical leave necessitated by major depression, brought on at least to some degree by the collapse of his marriage and the death of his mother. He was immediately faced with the significant requirements of the PIP, the weekly meetings with Vincent that based on plaintiff's evidence would have been very difficult for someone in plaintiff's state of health, and the extensive list of what Vincent considered to be plaintiff's continued failures. A reasonable person could perceive such working conditions and atmosphere to be hostile and abusive to the extent that he would feel compelled to resign.

Defendant also argues that plaintiff's prima facie case fails because he cannot show that he was otherwise qualified for the AUSA position because he was not meeting his employer's expectations. Defendant relies on the testimony of Vines, Vincent, and Phillips as well as the documentation from the PIP to demonstrate that plaintiff was not performing to defendant's expectations and was thus not qualified for the position of an experienced AUSA.

In *Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564 (6th Cir. 2003), the

14

Sixth Circuit set out the requirements a plaintiff must meet to satisfy the qualification prong of the prima facie test. The court stated:

> At the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job. The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.

*Id.* at 575-76 (emphasis in original and internal citations omitted).

Initially, the court observes that plaintiff performed as an AUSA in the U.S. Attorney's office for approximately ten years before his problems began around 2000 and also that at the time when defendant contends plaintiff's performance was so inadequate, he was experiencing personal difficulties and depression.

In response to defendant's motion, plaintiff has presented evidence demonstrating that he performed as an able attorney who represented the government in a conscientious and professional way during his tenure at the U.S. Attorney's office. Ernest Williams, the former U.S. Attorney who hired plaintiff for the Nashville office, described plaintiff as "an excellent litigator of the highest ethical standards." Robert Washko and Robert Anderson, AUSAs who worked with plaintiff, found him an able attorney who showed good judgment and integrity. AUSA Kennedy testified in deposition that plaintiff was very good in the performance of his duties as an AUSA. He commented that plaintiff

15

is one of the better public speakers he has encountered; that his written work was quite good; and that he was committed to doing his work in a timely and appropriate manner.

Additionally, three of the United States District Judges from the Middle District of Tennessee, the Hon. Thomas A. Wiseman, the Hon. John T. Nixon, and the Hon. Thomas A. Higgins, have presented declarations in which each of them observed that when plaintiff appeared before them he was a "very able attorney who represented the Government in a conscientious and professional manner." They also observed that plaintiff "showed good judgment and integrity and had an admirable ability to be objective and fair in his work."[2]

While the court believes that application of the *Wexler* standard shows that plaintiff had the objective qualifications necessary for the AUSA position and that he was qualified for that job, there is at a minimum a material question of fact concerning the qualification prong of plaintiff's prima facie case. Because there are material issues of fact on two prongs of plaintiff's prima facie claim of age discrimination, summary judgment on that claim is not appropriate.

## 2. Direct Evidence

Plaintiff also contends that there is direct evidence to support his age discrimination claim. "To succeed on a 'direct evidence' claim, a plaintiff must come

---

[2] Judge Wiseman also stated the following in his declaration: "At some time after Mr. Vines became U.S. Attorney for the Middle District, I had a conversation with him in my chambers and I expressed my concern that age discrimination against older AUSAs was occurring in his office."

forward with direct evidence that 'an illegitimate criterion' - e.g., a person's age, race, or sex - 'was a substantial factor' in the adverse employment action.  If such evidence is presented, the burden then shifts to 'the employer to convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor.'"  *Scott v. Potter*, 182 F. App'x 521, 525 (6th Cir. 2006) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276 (1989), *maj. op. overruled by statute on other grounds*, § 107 of the Civil Rights Act of 1991.

Plaintiff identifies several examples of what he contends is direct evidence of age discrimination. The following examples from the record could be considered as direct evidence of age discrimination.[3]

1.      Vines initiated through Watson a lunch meeting with Nancy Jones, a former AUSA who is now working at a law firm in Nashville.  In her response to an investigational questionnaire, Jones stated:

> Mr. Vines told me that he was in the process of meeting with the heads of the litigation departments of all the major firms in Nashville and it was due to my position at Waller Lansden that he had invited me to lunch.  He stated that he thought the office had too many entrenched senior lawyers and that newer lawyers needed to be hired. . . .
>
> I recall expressing a little surprise at this statement and asked him how he intended to get the more experienced lawyers to

---

[3] The court takes no position at this time concerning the nature or admissibility of plaintiff's evidence that is not set out here as direct evidence.

> leave since it had always been my understanding of DOJ policy
> during my tenure as an Assistant that an AUSA's employment
> could only be terminated for cause. Mr. Vines did not answer
> my question directly, but said that he thought there were several
> senior people who were ready to move on, if the right position
> in private practice could be identified.

Mr. Watson's declaration confirms what Vines said to Jones.

2.     When Watson told Vines that senior attorneys in the office would not easily leave or retire because they had many years of federal service and vested retirement benefits, Vines responded that "there are other ways to get rid of people."

3.     Jimmie Lynn Ramsaur, a senior AUSA, was made a team leader in June 2002 by Vines. After that appointment and during a meeting with Vines he asked her, "Why don't you see if you can get Washko to retire?" Washko was a senior attorney in the office.

4.     A few months after Vines was appointed, Lee Ann Bauer, the Administrative Officer for the office, provided Vines with a list of employees who were either currently eligible to retire and would be eligible within five years. Vines asked her how they could make those eligible to retire to do so. According to Bauer, Vines had already indicated in at least one all employee meeting that he wanted to hire "younger people" and would help anyone interested in leaving, particularly attorneys, to find a job.

5.     Robert Thompson, a management consultant used by Vines, testified regarding Vines's effort to find positions for older attorneys.

> Q.     Did Jim Vines ever tell you or anybody ever tell you that
> he wanted to find new positions for some of the older lawyers in
> the office?

18

A.     I think he was very sensitive about their level of performance; and if they couldn't get to the next level, could he somehow assist them in some career change, I think that was talked about, yes, but - -

Q.     What do you remember about those conversations?

A.     You know, I think that he looked at other federal agencies, other organizations that perhaps had a need or a willingness that he approached in kind of a vocational counseling kind of way. . . . [4]

6.     The plaintiff testified that Vincent, on behalf of Vines, offered the older attorneys a "glowing letter" and to help him and others seek employment elsewhere or retire.

Defendant argues that "Plaintiff has presented only minimal direct evidence of age discrimination" and that the majority of the examples of direct evidence identified by plaintiff do not relate to plaintiff or the claims in this case, are unsupported by the record, and do not support plaintiff's case. Because defendant argues basically that the alleged direct evidence is insufficient, he does not address how the burden shifts to him to demonstrate that it was more likely than not that the same decision would have been made without consideration of the improper age factor. However, even if defendant had addressed his burden at this stage, there are material questions of fact remaining for trial. For example, issues exist concerning plaintiff's performance during 2003, the use of the PIP, and implementation of the PIP that would impact any justification offered by defendant for taking

_____

[4] Dr. Thompson testified that he was told by Phillips and Vines that he was subpoenaed in this case "because Larry Moon who I did not know, had not met, had elected to pursue litigation because he was fired.*"

the action he did concerning plaintiff.

### 3. Hostile Work Environment Based on ADEA

Plaintiff also contends that defendant created a hostile work environment based on age in the way the older attorneys in the office were treated and in the way plaintiff's PIP was implemented. Relying on his examples of direct evidence, plaintiff argues that these statements created an intimidating hostile and offensive work environment for the attorneys in the protected age class. Plaintiff also urges the court to look beyond Vine's facially neutral policies and practices to see how they created a hostile environment and how they reflect evidence of a discriminatory animus. With regard to implementation of the PIP, plaintiff contends that the abusive and mean spirited manner in which it was implemented is evidence of an intimidating and hostile work environment.

Defendant argues that the policies about which plaintiff complains were office wide and applicable to all AUSAs, not just to plaintiff or the older attorneys. With regard to implementation of the PIP, defendant counters that plaintiff offers only his self-serving allegations that the PIP was administered in a harsh and unfair manner, as there is nothing in the documents memorializing the PIP meetings that reflect such treatment. Defendant argues that there is no evidence to support the allegation that the PIP was enforced in a "mean" fashion such that it would create an intimidating, hostile, or offensive environment.

In *Crawford v. Medina General Hospital*, 96 F.3d 830 (6th Cir. 1996), the Sixth Circuit held that a hostile work environment claim is cognizable under the ADEA. The

20

Court set out the following criteria for establishing a prima facie claim:

> 1. The employee is 40 years old or older;
> 2. The employee was subjected to harassment, either through words or actions, based on age;
> 3. The harassment had the effect of unreasonably interfering with the employee's work performance and creating an objectively intimidating, hostile, or offensive work environment; and
> 4. There exists some basis for liability on the part of the employer.

*Id.* at 834-35. The harassment is evaluated using both an objective and subjective standard. The environment must be objectively hostile to a reasonable person, and plaintiff must subjectively perceive the environment to be abusive or hostile. *Id.* at 835.

In addition, a court must look at the totality of the circumstances when applying this standard. "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

The court concludes that there are material issues of fact concerning prongs two and three of the prima facie case for a hostile work environment. The treatment plaintiff received during implementation of the PIP could be considered by the factfinder to be objectively and subjectively harassing and as a means of discriminating against plaintiff based on his age. Material issues of fact also exist as to prong three based upon the conduct displayed toward plaintiff during the PIP. Arguably that conduct unreasonably interfered

21

with plaintiff's ability to perform his work, and from the point of view of a reasonable factfinder it could have created an intimidating and hostile environment for the plaintiff. Accordingly, summary judgment on this claim is not appropriate.

## B. Count II - RA Claim

Plaintiff's disability claim is brought pursuant to the RA, "which provides the remedy for federal employees alleging disability discrimination." *Peltier v. United States*, 388 F.3d 984, 989 (6th Cir. 2004); *see also Felder v. Runyon*, No. 00-1011, 2000 WL 1478145, at *1 (6th Cir. 2000) ("[T]he [Rehabilitation] Act is the exclusive means for a federal employee to bring a claim of disability in federal court."). The RA provides:

> No otherwise qualified individual with a disability . . . shall, **solely** by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency[.]

29 U.S.C. § 794(a) (emphasis added). Both the RA and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, prohibit discrimination based upon disability, and "analyses of claims made under the two acts run roughly parallel." *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002) (citing *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459-60 (6th Cir.1997)). The standards under the ADA apply to RA cases involving employment discrimination. *McPherso*n, 119 F.3d at 460; *see also Burns v. City of Columbus, Dep't of Pub. Safety*, 91 F.3d 836, 842 (6th Cir. 1996) ("By statute, the Americans

22

with Disabilities Act standards apply in Rehabilitation Act cases alleging employment discrimination.") (citing 29 U.S.C. § 794(d)).  Thus, the court will look to authority and cases dealing with both the RA and ADA for the analysis herein.

"To make out a *prima facie* employment discrimination case under either Act, a plaintiff must show (1) that she or he is an individual with a disability, (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation, and (3) who was discriminated against **solely** because of the disability."[5] *Mahon*, 295 F.3d at 589 (emphasis added) (citations omitted).  In this case, plaintiff's disability claim appears to be based primarily on a failure to accommodate.  As such, the prima facie case would be somewhat modified.  The first and second prongs would remain the same.  However, the third prong would be that the employer was aware of plaintiff's disability, and the fourth prong would be that the employer failed to provide a reasonable and needed accommodation for plaintiff's disability.  *Smith v. Ameritech*, 129 F.3d 857, 866 (6th

---

[5] The court observes that in the Sixth Circuit under both the RA and the ADA the plaintiff must show that the employment action taken against him was based "solely" on his alleged disability.  *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996); *Maddox v. Univ. of Tenn.*, 62 F.3d 843, 846 (6th Cir. 1995).  The Sixth Circuit does not permit a plaintiff to recover under the ADA in a mixed motive case.  *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 454 (6th Cir. 2004) (district court correct in requiring ADA plaintiff to show that her disability was the sole reason for not hiring her); *McLeod v. Parsons Corp.*, 73 F. App'x 846, 858 (6th Cir. 2003) (ADA and ADEA case) ("We decline McLeod's request that this panel permit plaintiffs to recover under the ADA in mixed motive cases.).  Arguably, because plaintiff contends that he was discriminated against based on age and retaliated against because of his EEOC activity, he could not prevail on his RA claim.  However, as discussed herein, plaintiff cannot make a prima facie showing under the RA because he is not an individual with a disability as defined by applicable law, and his RA claim fails on that basis.

23

Cir. 1997) (brought under ADA); *Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997) (brought under RA). "It goes without saying that an individual cannot make a *prima facie* showing of disability discrimination under the Rehabilitation Act, unless he is, in fact, disabled within the meaning of the Act." *Vonderheide v. U.S. Post Office*, No. 97-5508, 1998 WL 432478, at *2 (6th Cir. July 16, 1998). In the court's opinion, the plaintiff herein cannot make that showing.

> To be "disabled" for the ADA and the Rehabilitation Act, an individual must (1) have a physical or mental impairment which "substantially limits" him or her in at least one "major life activity," (2) have a record of such an impairment, or (3) be regarded as having such an impairment. *See* 29 U.S.C. § 705(20)(B) (Rehabilitation Act definition); 42 U.S.C. § 12102(2) (ADA definition).

*Mahon*, 295 F.3d at 589.

"Major life activities" include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Mahon*, 295 F.3d at 590 (citing 45 C.F.R. § 84.3(j)(2)(ii)); *see also* 29 C.F.R. § 1630.2(i). To be substantially limited in the performance of a major life activity, "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term." *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 198 (2002) (citing 29 C.F.R. §§1630.2(j)(2)(ii)-(iii) (2001)).

Whether the plaintiff is disabled is an individualized inquiry. *See Sutton v.*

24

*United Air Lines, Inc.*, 527 U.S. 471, 483 (1999). Plaintiff contends that his impairment is major depression, and defendant does not dispute this contention. *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 314 (6th Cir. 2001) ("The district court assumed, and the parties do not dispute, that major depression is a mental impairment.") (citations omitted). However, having an impairment is not in and of itself sufficient to show disability; a plaintiff must prove that the impairment substantially limits a major life activity. *Williams*, 534 U.S. at 198. "An individualized case-by-case assessment of the effect of that impairment on the plaintiff's life is required, including the extent of its limitation on a major life activity and the effect of any corrective or mitigating measures taken by the plaintiff." *Cartwright v. Lockheed Martin Util. Servs., Inc.*, 40 F. App'x 147, 153 (6th Cir. 2002) (citing *Williams*, 534 U.S. at 198). "[T]he ADA's coverage is restricted to only those whose impairments are not mitigated by corrective measures." *Sutton*, 527 U.S. at 487. "When an ADA plaintiff can fully compensate for an impairment through medication, personal practice, or an alteration of behavior, a disability under the Act does not exist." *Knapp v. City of Columbus*, 192 F. App'x 323, 329 (6th Cir. 2006).

   Defendant initially concluded and argued that plaintiff's claimed major life activity is working and that he failed to demonstrate that he is substantially limited in that major life activity. Plaintiff has responded that the major life activities that are limited by his impairment are thinking, concentrating, and interacting with others, not working. He also argues that caring for himself is a major life activity that is substantially limited by his depression.

25

If plaintiff were claiming work as a major life activity, the court agrees with defendant that plaintiff cannot prevail on that claim. In *Sutton* and *Williams*, the Supreme Court assumed without deciding that working is a major life activity. *Sutton*, 527 U.S. at 492; *Williams*, 534 U.S. at 200. Under *Sutton*, "substantially limits" requires that a plaintiff allege that he or she is "unable to work in a broad class of jobs." *Sutton*, 527 U.S. at 491 ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.") (quoting 29 C.F.R. § 1630.2(j)(3)(i)).

> To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Sutton*, 527 U.S. at 492.

Plaintiff herein has not made the required showing regarding work as a major life activity. The administrative record reflects that plaintiff is employed as an assistant public defender in Columbia, Tennessee. Obviously, then, he is able to perform work in his profession and is not precluded from working in a "broad class of jobs" as an attorney. Additionally, there is no proof in the record concerning the availability or unavailability to the plaintiff of a broad class of jobs. Plaintiff has thus not demonstrated that he is disabled based on the major life activity of working. The court will therefore turn to the major life activities that plaintiff contends are substantially limited by his impairment.

With regard to thinking, that function "has been held to be a major life

26

activity." *Salim v. MGM Grand Detroit, L.L.C.*, 106 F. App'x 454, 459 (6th Cir. 2004) (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 307 (3rd Cir. 1999)); *see also Mulholland v. Pharmacia & Upjohn, Inc.*, No. 4:99-CV-98, 2001 WL 311241, at *4 (W.D. Mich. Feb. 15, 2001); *but see Hill v. Metro. Gov't of Nashville,* 54 F. App'x 199, 201 (6th Cir. 2002) (court doubtful that thinking is a major life activity under the ADA).

As to interacting with others, that concept may be a major life activity. In *MX Group, Inc. v. City of Covington*, 293 F.3d 326 (6th Cir. 2002), the Sixth Circuit did not decide the issue but noted "that it has been held that 'interacting with others,' is a major life activity." *Id.* at 337 (citing *McAlindin v. County of San Diego*, 192 F.3d 1226, 1233 (9th Cir. 1999)); *see also Morgan v. Masterfoods USA, Inc.*, No. 2:04-CV-907, 2006 WL 3331780, at *5 (S.D. Ohio Nov. 14, 2006); *Verhoff v. Time Warner Cable, Inc.*, No. 3:05CV7277, 2006 WL 3304179, at *5 (N.D. Ohio Nov. 13, 2006) (both cases citing *MX Group*). For the purposes of argument, the court will consider interacting with others as a major life activity.

The Sixth Circuit has held that concentrating is not a major life activity. In *Linser v. Ohio, Dep't of Mental Health*, No. 99-3887, 2000 WL 1529809, at *3 (6th Cir. Oct. 6, 2000), the Court followed the Tenth Circuit decision in *Pack v. Kmart Corp.*, 166 F.3d 1300 (10th Cir. 1999) and held:

> [D]ifficulties in performing the task of concentrating do not make [a person] disabled within the meaning of the ADA because concentrating is not a major life activity. As the Tenth Circuit noted in *Pack v. Kmart Corp.*, "[c]oncentration may be a significant and necessary component of a major life activity,

27

> such as working, learning, or speaking, but it is not an 'activity'
> itself" *Pack*, 166 F.3d at 1305.

*Linser*, 2000 WL 1529809 at *3; *see also Boerst v. Gen. Mills Operations, Inc.*, No. 00-3281, 2002 WL 59637, at *3 (6th Cir. Jan. 15, 2002); *Verhoff v. Time Warner Cable, Inc.*, No. 3:05CV7277, 2006 WL 3304179, at *5 (N.D. Ohio Nov. 13, 2006); *Van Compernolle v. City of Zeeland*, No. 1:05-CV-133, 2006 WL 1460035, at *7 (W.D. Mich. May 24, 2006); *Kronner v. McDowell & Assocs. Inc.*, No. 04-74657, 2005 WL 3478358, at *3 (E.D. Mich. Dec. 20, 2005); *McConnell v. Swifty Transp., Inc.*, No. 2:04-CV-0153, 2005 WL 1865386, at *15 (S.D. Ohio July 29, 2005); *but see Swanson v. Univ. of Cincinnati*, 268 F.3d 307 (6th Cir. 2001) (district court and parties assumed concentrating was a major life activity).

As to caring for one's self, that function is listed in the regulations as an example of a major life activity. Therefore, the court will consider whether plaintiff is substantially limited in the major life activities of thinking, interacting with others, and caring for himself. In addition, even if concentration is considered a major life activity, for the reasons stated below, plaintiff is not substantially limited in his ability to concentrate.

"[T]he term 'substantially limits' means inability to perform, or a severe restriction on the ability to perform as compared to the average person in the general population." *Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir. 1996) (citing 29 C.F.R. § 1630.2(j)(1) (1995)). Substantially limits also means "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person

28

in the general population can perform that same major life activity." *Swanson*, 268 F.3d at 315 (citing 29 C.F.R. § 1630.2(j)(1)). Factors to consider when determining whether plaintiff's impairment substantially limits any of his major life activities include: "1. the nature and severity of the impairment; 2. the duration or expected duration of the impairment; and 3. the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id*. (citing 29 C.F.R. § 1630.2(j)(2)).

Defendant argues that plaintiff's depression is periodic and for the most part is controlled with medication. He also points out that Dr. Poling's records do not reference that plaintiff is substantially limited in the major life activities of thinking, interacting with others, and caring for himself; Dr. Poling references only plaintiff's ability to work and working as an AUSA. Defendant also contends that these major life activities are subsumed within the life activity of working and no accommodation could be provided that would permit plaintiff to perform the job of an AUSA if he has these limitations.

Plaintiff argues that Dr. Poling's declaration indicates that plaintiff's impairment was long term and that it significantly impacted the major life activities of thinking, interacting with others, and caring for himself and that plaintiff was periodically substantially limited in his ability to work. Plaintiff also contends that because of the nature of his impairment, there is indefinite potential that his ability to work will be substantially limited. Additionally, plaintiff points out that the testimony of others who observed him supports his contention that the major life activities of thinking, interacting with others, and caring for himself were substantially limited.

29

However, plaintiff fails to take into consideration that when he was placed on medication and under treatment his condition improved and he was able to return to work after a medical leave of absence. Dr. Poling released plaintiff to work and assume his duties as an AUSA, with a recommendation for a day off in the middle of the week "if practicable." Plaintiff's entire argument on this issue centers around his condition at the time of the alleged discrimination. The testimony from Delk Kennedy and Michael Roden relied on by plaintiff to demonstrate how he was limited basically describes plaintiff at his worst state, unmedicated and untreated. Plaintiff's own declaration provides only brief, conclusory statements regarding his limitations, and there is no evidence to show how plaintiff is limited in these major life activities in "condition, manner or duration" as compared to the average person in the general population. *Id.*

This court must consider plaintiff's impairment not only at the time of the alleged discrimination but up to the present. *Roush v. Westec, Inc*., 96 F.3d 840 (6th Cir. 1996). In *Roush*, the Sixth Circuit "considered the fact that the plaintiff's kidney condition had been corrected by treatment and no longer affected her ability to work, a result occurring after the time of the discriminatory acts, in determining that this condition was temporary and not substantially limiting." *Swanson*, 268 F.3d at 316 (citing *Roush,* 96 F.3d at 844). In addition, the fact that plaintiff's symptoms may reoccur in the future is also not sufficient to establish the impairment as substantially limiting. *Swanson,* 268 F.3d at 316. "*Roush* ruled that the mere possibility that an adverse health condition could recur or require further treatment was not sufficient to establish that the condition was substantially limiting." *Id.*

30

(citing *Roush*, 96 F.3d at 844).

There is nothing in the record demonstrating that plaintiff is presently substantially limited in his thinking, interacting with others, caring for himself, or even concentrating. What can be gleaned from the record is that plaintiff appears to be functioning well as a state public defender in the town where he lives. Plaintiff's deposition and administrative interview do not reflect that plaintiff is unable to think, concentrate, take care of himself or interact with others. All of these activities are necessary for an individual to function as an attorney, whether as a public defender, AUSA, or private practitioner. If plaintiff were substantially limited in these activities to the degree required by law, he could not function as an attorney, in any professional capacity. The court, therefore, concludes that plaintiff has not raised a material issue of fact concerning whether he is disabled as defined by applicable law. Thus, plaintiff cannot demonstrate a prima facie case, and summary judgment on his RA claim is appropriate.

## C. Count III - Title VII Retaliation Claim

Plaintiff contends that he was retaliated against because he engaged in protected activity by contacting the EEO office and by filing a complaint with the EEOC. He argues that placing him on the PIP, the implementation of the PIP, reporting him to the OPR, and his constructive discharge constitute acts of retaliation. Defendant argues that plaintiff cannot establish a prima facie case of retaliation under Title VII because plaintiff was placed on the PIP prior to engaging in protected activity; there is no causal connection

31

between the management of the PIP and plaintiff's discrimination complaint; there is no causal connection between the referral to OPR and plaintiff's contact with the EEOC counselor; and there is no proof of plaintiff experiencing an adverse employment action. Plaintiff contacted the EEO Office July 30, 2003, and filed his complaint of discrimination on September 13, 2003.

A claim of retaliation is analyzed by the well established *McDonnell Douglas/Burdine* burden-shifting framework. *See DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004). To demonstrate a prima facie case of retaliation under Title VII, a plaintiff must prove: "(1) he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Ford v. Gen. Motors Corp*., 305 F.3d 545, 552-53 (6th Cir. 2002) (citations omitted). Once the plaintiff has made out a prima facie case, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for its actions. *Id*. at 553. If the employer meets this burden, the burden shifts to the plaintiff to demonstrate that the proffered reason is not the real reason for the employment action. *Id.* The ultimate burden of persuasion remains with the plaintiff at all times during the process. *Id*.

In *Burlington Northern & Santa Fe Railway Co. v. White*, ___ U.S. ___, 126 S. Ct. 2405, 2414-16 (2006), the Supreme Court clarified what constitutes an adverse employment action in a retaliation case. The Court held that the standard for retaliation is broader than that in discrimination cases under Title VII. To prove retaliation, "a plaintiff

32

must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 2415 (internal quotations omitted). The individual circumstances and context of a case are the backdrop for a court's consideration of whether an employment action is materially adverse to a reasonable employee. The Court stated:

> We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.

*Id*.

The first two prongs of the prima facie case have been met. There is no dispute that plaintiff engaged in protected activity when he contacted the EEO Office and filed a complaint of discrimination, and there is no dispute that this activity was known to defendant. With regard to the third prong, the court finds that there are material issues of fact concerning whether defendant took an adverse employment action against the plaintiff. The court has already found issues for trial concerning plaintiff's contention that a constructive discharge was the adverse employment action taken against him. Those issues and the context and circumstances surrounding them remain applicable in plaintiff's retaliation claim.

Defendant additionally contends that plaintiff cannot demonstrate a prima facie case of retaliation because he cannot meet the fourth prong, the showing of a causal

33

connection between the protected activity and the adverse actions plaintiff alleges were taken against him. "To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997); *Jackson v. RKO Bottlers*, 743 F.2d 370, 377 (6th Cir. 1984)). He must present evidence "sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990) (citations omitted). The causal link can be shown through direct evidence or by knowledge in conjunction with a closeness in time which raises an inference of causation. *Parnell v. West*, No. 95-2131, 1997 WL 271751, at *2 (6th Cir. May 21, 1997) (citations omitted). "However, temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." *Id.* (citations omitted).

The court again concludes that there are material issues of fact. For example, the factfinder could infer that the manner in which the PIP was implemented was the result of plaintiff's EEOC activity. The timing of the PIP-related conduct in relation to the protected activity also supports this inference, as does the defendant's reporting of plaintiff to the OPR. Ten days after plaintiff filed his complaint with the EEOC defendant reported him to the OPR. Accordingly, there are material issues of fact regarding plaintiff's retaliation claim that must be resolved at trial, and summary judgment is not appropriate.

34

## IV.

### *Conclusion*

Accordingly, defendant's motion for summary judgment as to Count I, plaintiff's ADEA claim, [doc. 74] will be denied in its entirety. The motion to dismiss or alternatively for summary judgment as to Counts II and III [doc. 22] will be granted in part and denied in part. The motion will be granted as to Count II, and plaintiff's RA claim will be dismissed. The motion will be denied as to Count III, plaintiff's Title VII retaliation claim. An order consistent with this opinion will be entered.

ENTER:

          s/ Leon Jordan         
United States District Judge

Case 3:05-cv-00102   Document 92   Filed 03/29/07   Page 35 of 35 PageID #: 2044